# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## SOUTHEASTERN DIVISION

ANDREW W. SCHLIMME,     )
                               )
     Plaintiff,          )
                               )
     vs.              )     Case number 1:10cv0028 TCM
                               )
MICHAEL J. ASTRUE,       )
Commissioner of Social Security,   )
                               )
     Defendant.       )

## MEMORANDUM AND ORDER

This is a 42 U.S.C. § 405(g) action for judicial review of the final decision of Michael J. Astrue, the Commissioner of Social Security (Commissioner), denying Andrew Schlimme's (Plaintiff) application for disability insurance benefits (DIB) under Title II of the Social Security Act (the Act), 42 U.S.C. § 401-433.[1]  Plaintiff has filed a brief in support of his complaint; the Commissioner has filed a brief in support of his answer.

## Procedural History

Plaintiff applied for DIB in December 2005, alleging he was disabled as of September 26, 2005, by chronic pulmonary insufficiency.  (R.[2] at 56-60.)  His application was denied initially, on reconsideration, and after a hearing held in March 2007 before Administrative Law Judge (ALJ) Robert E. Ritter.  (Id. at 9-26, 44-52, 284-338.)  The Appeals Council then

---

[1]The case is before the undersigned United States Magistrate Judge by written consent of the parties.  See 28 U.S.C. § 636(c).

[2]References to "R." are to the administrative record filed by the Commissioner with his answer.

denied Plaintiff's request for review, effectively adopting the ALJ's decision as the final decision of the Commissioner.  (Id. at 4-6.)

## **Testimony Before the ALJ**

Plaintiff, represented by counsel, and Jeffrey F. Magrowski, Ph.D., testified at the administrative hearing.

Plaintiff testified that he is married and has a three-year old son that lives with him part-time.[3]  (Id. at 289.)  He lives with his parents in their old house.  (Id. at 307.)  He has two years of college and an Associate's degree in automotive technology and computer diagnostics for automobiles.  (Id. at 325.)

Plaintiff has a worker's compensation claim pending based on his pulmonary problems.  (Id. at 290.)

Plaintiff worked as an auto technician "on and off" from 1984 to 2005, when pulmonary problems caused by the chemicals, including asbestos, he had been exposed to forced him to stop.  (Id. at 289-90.)  He had been a smoker but had stopped ten years earlier.  (Id. at 290.)  When he worked at a dealership in Alabama, he started having a sore throat and persistent, productive cough.  (Id. at 293.)  His eyes were constantly irritated and he had chest pains.  (Id.)  He missed ten to fifteen days of work over a six-month period.  (Id.)  In October 2001, four months after he left that job and was at a job where certain chemicals were not used, he had to be hospitalized.  (Id. at 294.)  He was then diagnosed with asthma and the onset of emphysema.  (Id.)  He continued to work but avoided places that used the particular

_____

[3]Plaintiff was 40 years old at the time of the hearing.  (See id. at 119.)

chemicals that had caused his problems.  (Id.)  He then noticed that he was susceptible to dust, cold, and aerosol sprays.  (Id.)  In 2003 and 2004, he would have asthma attacks every four to six months.  (Id. at 295.)

From June to November of 2004, Plaintiff worked again at a garage that used the same chemicals used by the Alabama dealership.  (Id.)  His symptoms magnified; his asthma attacks became more frequent; and his fatigue was worse.  (Id.)  His productivity dropped to nothing and he had to leave work.  (Id.)  He could not lift anything heavy and could not do anything requiring physical exertion.  (Id.)  He was hospitalized twice more and had bronchial treatments, steroid shots, and a pulmonary function test.  (Id. at 296.)

Plaintiff last worked in September 2005.  (Id.)  Although the auto shop he worked at did not employ the offensive chemical, he could not tolerate the dust from the gravel lot. (Id.)  Also, the shop was a 45-minute drive from home and he could not afford to keep driving back and forth.  (Id.)

Since he stopped working as an auto mechanic, he had tried helping a friend with his floor covering business but could not do the heavy lifting or tolerate the glue used.  (Id. at 297.)  Paint and animals affect his breathing.  (Id.)  His problems have not gotten worse since he stopped working unless he is exposed to something.  (Id. at 298.)  For instance, when riding his motorcycle recently he had an asthma attack when he was stuck behind a car with bad exhaust.  (Id. at 298-99.)  He had also had one when he was seated at a restaurant near a woman wearing too much perfume.  (Id. at 299.)  Any chemical that is overpowering and "[a]nything that's combusted" sets off his symptoms.  (Id.)  He cannot be around cigarette

smoke, gasoline fumes, steam, or cold air.  (Id. at 299-300.)  He has to keep his house

temperature at 70 degrees.  (Id. at 300.)  His house has two dehumidifiers, filters on his

furnace, allergy-free filters on his air conditioner, and an attic fan.  (Id. at 301, 302.)  He has

removed the carpet from the downstairs.  (Id. at 301.)  He mops the floors every day with

water.  (Id. at 302.)  If his wife has to use a cleaning solution, she makes sure he is out of the

house.  (Id.)  He has to avoid mold.  (Id.)

Plaintiff's resistance to illness is low.  (Id.)

Plaintiff receives Medicaid.  (Id. at 297.)  He has had a pulmonary function test every

year since 2004.  (Id.)

Plaintiff received unemployment benefits for sixteen weeks when he first stopped

working.  (Id. at 307.)

A nurse at the Cross Trails Medical Center completed a residual functional capacity

(RFC) assessment for him based on his pulmonary problems.  (Id. at 298.)

Plaintiff is not able to engage in much physical exertion.  (Id. at 303.)  For instance,

he could carry a 50-pound cylinder head for only 50 feet before having to stop and rest for

20 minutes.  (Id.)  If he is having a good day and has not been exposed to anything, he can

go slowly up three flights of stairs.  (Id.)  If possible, he takes the elevator.  (Id.)  If he

engages in a repetitive activity, e.g., using a tire jack, he becomes short of breath.  (Id. at

307.)

If he has an attack, it takes him a couple of hours to recover.  (Id. at 304.)  He has

passed out when not stopping activity during an attack.  (Id.)  When having an attack, he

coughs and wheezes.  (Id.)  He gets fatigued and is easily upset.  (Id. at 305.)  His symptoms are not always present but are triggered by something.  (Id.)

Asked to describe a typical day, Plaintiff testified that he gets up around 5:00 in the morning, cooks breakfast or eats cereal, lets his short-haired cat out, plays with his son "a little bit," goes outside and tinkers with old cars, does things on the farm that need to be done, eats dinner, and uses the computer or watches television.  (Id. at 305-06.)  He tries to stay active, does what he can, and relaxes when he gets out of breath or tired.  (Id. at 306.)  He cannot do such household chores as cleaning out the litter boxes.  (Id. at 306.)  The work on the farm includes such tasks as driving a tractor and helping to check on the fences.  (Id. at 313-14.)  The tractor is one that does not emit exhaust fumes in his direction.  (Id. at 313.)  He puts in two or three hours of work on an average day.  (Id. at 314.)  The heaviest weight he handles is a five-gallon bucket of water weighing thirty-five to forty pounds.  (Id.)  He wears a paper mask when he works around the farm.  (Id. at 32.)

Plaintiff recently had a magnetic resonance imaging (MRI) of his back to investigate the cause of sharp pains between his shoulder blades.  (Id. at 308, 309.)  He had been having these pains for three months.  (Id. at 308.)  He has a herniated disc in his back.  (Id. at 308.)  The day before the hearing, he had seen a neurologist.  (Id.)

Plaintiff had been receiving physical therapy, which had helped, but he stopped that because he could not afford the gas to get back and forth.  (Id. at 310.)

Asked by the ALJ if he thought he could do any work eight hours a day, five days a week, Plaintiff replied that he did not think he could sustain employment.  (Id. at 311.)

In the last sixteen months, Plaintiff had been to the emergency room three or four times. (Id. at 316.) He uses a nebulizer machine four times a day at most. (Id.) He uses an inhaler during the day. (Id. at 317.) He does not have oxygen at home. (Id. at 321.)

Plaintiff takes an anti-anxiety medication, Celexa, because of anger problems. (Id. at 318-19.) Also, 75% of the knuckle on his left index finger was destroyed in a workplace accident in 2003. (Id. at 332.) He takes hydrocodone twice a day. (Id.) He can pinch, but without any pressure or strength. (Id. at 333.) The cold really affects it. (Id.)

Dr. Magrowski testified as a vocational expert (VE).

He was first asked if Plaintiff would be able to do any of he work that he had done in the past with the breathing problems he had described. (Id. at 326.) The VE replied that he could not, nor did he have any transferable skills. (Id.) Plaintiff also could not do any work at all because of the breathing problems he had "in just about any situation." (Id. at 327.)

The ALJ then described a hypothetical claimant who could lift at the medium range, i.e., 50 pounds occasionally and 25 pounds frequently; could sit, stand, and walk with normal breaks for six hours in an eight-hour workday; could not more than occasionally climb ladders, ropes, or scaffold; had to avoid concentrated exposure to extreme cold and extreme heat and moderate exposure to fumes, odor, dust, gases, and poor ventilation; and had to avoid even moderate exposure to unprotected heights. (Id.) Such a claimant could not return to Plaintiff's past work. (Id.) He did have skills that would transfer to some semi-skilled assembly of small parts or inspection type work that was typically light or sedentary. (Id. at

327-29.) Such skills would include mechanical repair and electronic skills. (Id. at 328.) The described work existed in significant numbers in the state and national economies. (Id.)

If the claimant had to avoid all exposure to respiratory irritants such as shoes, odors, dust, gases, and poor ventilation, there were no jobs he could perform. (Id. at 330.) If the claimant would become short of breath and have to leave the worksite for at least fifteen minutes if he came into contact with an odor such as perfume or cigarettes smoke, the claimant could not sustain work activity on any exertional level. (Id. at 331.) If the claimant had a loss of function in his left index finger, he might not be able to do the assembly work but could do the inspection work. (Id. at 334.) Regardless of his transferable skills, the claimant could also work as a surveillance system monitor, a charge account clerk, or a general clerk. (Id. at 335-36.) These jobs existed in significant numbers in the state and national economies. (Id.)

## Medical and Other Records Before the ALJ

The documentary record before the ALJ included forms Plaintiff completed as part of the application process, documents generated pursuant to his application, records from health care providers, and assessments by examining and non-examining consultants.

When applying for DIB, Plaintiff completed a Disability Report. (Id. at 138-48.) He listed his height as 5 feet 10 inches tall and his weight as 180 pounds. (Id. at 138.) Asthma, a severe breathing disorder, chronic obstructive pulmonary disease (COPD), emphysema, and exposure to chemicals prevented him from working. (Id. at 139.) His illnesses first bothered him in November 2000 and stopped him from working on September 26, 2005, when he

could no longer do the job.  (Id.) His medications included Advair Diskus, Albuterol aerosol, Albuterol sulfate, and prednisone.  (Id. at 146.)  None had any side effects.  (Id.)

Plaintiff reported on a Daily Activities Questionnaire that he wakes up once a night needing a breathing treatment.  (Id. at 75.)  He is able to care for his personal needs without any assistance.  (Id.)  He does not cook or prepare meals because the heat from the stove affects his breathing.  (Id. at 76.)  His wife prepares all the meals.  (Id.)  He puts dirty clothes and dishes away.  (Id.)  In his spare time, he watches television, reads, listens to the radio, and plays with his son.  (Id.)  He goes outside three to four times a week to the grocery store and movie rental store.  (Id. at 77.)  He does not have any problems getting along with people.  (Id.)  Friends come to his house because they smoke in their houses.  (Id.)  He can perform a task or chore for one hour before having to take a break.  (Id. at 78.)  He had been laid off from a job because the time he had missed due to illness.  (Id.)  He was very susceptible to colds and upper respiratory conditions.  (Id. at 79.)

On a Physical Activities Questionnaire, Plaintiff described his daily activities as waking up around 6:00 a.m., cleaning the house, mowing the lawn, repairing and maintaining personal vehicles, doing household repairs, and playing with his son.  (Id. at 81.)  He has a loss of breath after minor exertion.  (Id.)  He is unable to walk more than one-half mile without stopping and resting.  (Id.)  He is able to stand for eight hours, walk for one hour, and sit for eight hours.  (Id.)  The steam from the shower causes breathing problems, so he has to take a cold shower.  (Id. at 82.)  Smoke and heat affect his breathing.  (Id. at 83.)  He is not able to barbeque or cook.  (Id.)  He cannot be in the house if cleaners or disinfectants are

being used. (Id.)  His doctor has told him he can no longer mow the grass because of the dust and allergens. (Id. at 84.)  Physical exertion causes him to be short of breath. (Id.)  After thirty to forty-five minutes of an activity, he has to stop and rest. (Id.)

Plaintiff's wife completed a Function Report on his behalf. (Id. at 130-37.)  She had known him for five years and reported that he spent his day watching television, reading, listening to the radio, and spending time with his two-year old son and on the Internet. (Id. at 130.)  Before his illness, he would run, swim, play sports outside, and sit outside. (Id. at 131.)  He woke up at least once a night unable to breathe. (Id.)  He had difficulty taking a shower because of shortness of breath. (Id.)  Five minutes every day, he spent time putting dirty dishes and clothes away. (Id. at 132.)  He went outside three times a week and shopped for food and personal needs. (Id. at 133.)  He cannot visit friends at their houses because of cigarette smoke and dogs. (Id. at 135.)  His illness adversely affects his ability to lift, walk, and climb stairs. (Id.)  He is right-handed. (Id.)  He cannot walk farther than one-half to one mile without having to stop and rest at least ten minutes. (Id.)  He can pay attention until he has an asthma attack. (Id.)  He has no difficulty following spoken or written instructions and gets along fine with authority figures. (Id. at 135-36.)

Also, Plaintiff completed a Disability Report – Appeal form after the initial denial of his application. (Id. at 70-74.)  There had been no change in his impairments and no new impairments since he had completed the initial report. (Id. at 70.)

Plaintiff had reportable annual earnings from 1984 to 2005, inclusive, with the exception of 1993. (Id. at 53.) Those earnings ranged from $71.83, in 1998, to $33,678.55, in 2000. (Id.)

The relevant medical records before the ALJ are summarized below in chronological order and begin with two MRIs of Plaintiff's left index finger in October 2003. (Id. at 278-79.) Plaintiff was unable to bend his finger and had persistent pain and swelling in it. (Id. at 278.)

On June 3, 2004, Plaintiff consulted the health care practitioners at Cape Family Practice about diarrhea, a cough which woke him at night, and shortness of breath on exertion. (Id. at 275.) He also had yellow areas under both his eyes. (Id.) He returned the following month, reporting that his breathing had improved on the Advair and Combivent, although he had a hard time remembering the Combivent inhaler. (Id. at 275.) He had a sore throat and chest pain. (Id.) He was diagnosed with COPD, an upper respiratory infection, hyperlipidemia, and degenerative joint disease and was to return in four weeks. (Id.) Plaintiff did so, requesting hydrocodone for his left index finger. (Id. at 274.)

On November 11, Plaintiff went to the emergency room at Southeast Missouri Hospital (SMH) with complaints of a cough for the past three weeks and difficulty breathing for the past three days. (Id. at 214-16.) He reported that he had quit smoking five years earlier, and had never smoked very much. (Id. at 214.) A chest x-ray revealed some fibropleural scarring but no active infilitrates or effusions and no cardiomegaly. (Id. at 215-16.) He was diagnosed with acute bronchitis and sinusitis with underlying asthma. (Id. at

215.)  It was also noted that he had chronic pain in his left index finger resulting from him trying to cut it off.  (Id. at 214, 215.)

Plaintiff returned to the SMH emergency room on December 15 with shortness of breath.  (Id. at 211-13.)  He reported that he did not, and had never, smoke and did not drink.  (Id. at 212.)  He had been told he has early emphysema.  (Id.)  A chest x-ray revealed no active cardiac or pulmonary disease.  (Id. at 211.)  It did show, however, hyperinflated lungs indicative of COPD.  (Id. at 212.)  He was diagnosed with exacerbation of COPD and chronic bronchitis, placed on a tapered dose of prednisone, given refills of his asthma medications, and given the names of two physicians who accepted Medicaid.  (Id.)

On April 6, 2005, Plaintiff went to the emergency room at Russellville Hospital in Alabama complaining of severe wheezing and shortness of breath.  (Id. at 266-73.)  He explained that he had had an inhalation injury eight years earlier.  (Id. at 267.)  A chest x-ray revealed "what appear[ed] to be little increased markings in the right upper lung . . . ."  (Id. at 273.)  Plaintiff was treated and released in no respiratory distress within two hours.  (Id. at 268, 269.)

Plaintiff first saw Edward F. Crockett, III, M.D., on July 26.  (Id. at 246-50.)  Plaintiff complained of fatigue, poor vision, poor sleep, weakness, problems breathing due to a chemical burn in his lungs, leg cramps at night, and pain in left second finger.  (Id. at 247.)  He denied depression, but reported taking Zoloft, an antidepressant, in the past after his brother was killed.  (Id.)  He was given refills for his Albuterol inhaler, Albuterol nebulizer, and Advair Diskus.  (Id. at 246.)  He was also given prescriptions for Ultracet, to be taken

as needed for pain, and Zoloft.  (Id.)  He was to be scheduled for a pulmonary function test, chest x-ray, blood tests, and urinalysis.  (Id.)  He was also given a low saturated fat, low cholesterol diet and told to engage in a regular exercise program.  (Id.)  He was to follow up in two weeks, or sooner if needed.  (Id.)  The chest x-ray was normal.  (Id. at 256, 265.)  The pulmonary function tests revealed a moderate obstructive lung defect.  (Id. at 261.)  After use of a bronchodilator, his FVC was changed by 34%; his FEV1 by 61%; his FEF 25-75 was changed by 86%.[4]  (Id.)  These numbers were interpreted to be a good response to the bronchodilator.  (Id.)

Plaintiff returned to Dr. Crockett on August 8.  (Id. at 243-45, 251.)  He was feeling about the same; he had not gotten the prescriptions given him at the prior visit filled.  (Id. at 245, 246.)  On September 2, Plaintiff complained to Dr. Crockett of low back pain and difficulty urinating.  (Id. at 239-43, 251.)  A urinalysis revealed an infection.  (Id. at 240.)  Plaintiff was told to drink water and cranberry juice, given an antibiotic for the infection, and given Vicodin to be taken as needed for pain.  (Id.)  He was to be started on medication for high cholesterol after his infection cleared up.  (Id.)  His medical problems were listed as asthma/COPD, hypoglycemia, hyperlipidemia, chronic pain in his left hand, nocturnal leg cramps, and depression.  (Id. at 239.)

---

[4]FVC is forced vital capacity; FEV-1 is the volume of air forcefully expired during the first second after a full breath.  Merck Manual of Diagnosis and Therapy, 608, 610 (16th ed. 1992).  "The mean forced expiratory flow over the middle half of the FVC (FEF25-75%) is *the slope of the line that intersects the spirographic tracing at 25% and 75% of the VC*."  Id. at 611.  "The FEF25-75%, because it is less effort-dependent than the FEV1, is a more sensitive indicator of early airways obstruction."  Id.

Plaintiff was taken by ambulance to the emergency room at Helen Keller Hospital (HKH) in Alabama on October 14 after experiencing a sudden asthma attack.  (Id. at 230-38.) He had had a cough and congestion for six days and was dizzy, weak, and short of breath.  (Id. at 233.)  A chest x-ray was normal.  (Id. at 235.)  The diagnosis was exacerbation of asthma and bronchitis.  (Id. at 234.)  Plaintiff was treated and discharged home in two hours in stable condition.  (Id. at 232.)

Plaintiff returned to the HKH emergency room on October 25 for shortness of breath for the past four days.  (Id. at 223-29.)  A social worker visited him in his room to answer his questions about how to apply for disability.  (Id. at 225, 228.)  His medical history included asthma, COPD, high cholesterol, anxiety, and bronchitis.  (Id. at 226.)  A chest x-ray revealed scarring changes in the upper lobes of his lungs.  (Id. at 229.)  He was treated with a nebulizer and Advair and told to follow-up at the clinic.  (Id. at 223.)

Plaintiff went to Crosstrails Medical Center (Crosstrails) in Cape Girardeau on July 26, 2006, to establish a primary care physician.  (Id. at 204-05.)  He reported a chemical burn to his lungs when at work in 2001 and chronic pain in his left index finger secondary to it being reattached following an accidental amputation.  (Id. at 204.)  His medical history included asthma and COPD.  (Id.)  He was to have a pulmonary function test.  (Id. at 205.) A chest x-ray indicated a mild obstructive airway pattern but no cardiomegaly or active pulmonary disease.  (Id. at 201.)  An August pulmonary function test revealed a FVC of 67% of predicted with a FEV1 of 1.23, or 31% of predicted, an FEF 25-75 of 9% of predicted, and a FEV1/FVC of 37% of predicted.  (Id. at 206-10.)  These results suggested a severe large

and small airways obstructive defect with reversibility with bronchodilators. (<u>Id.</u> at 210.)

After the administration of bronchodilators, Plaintiff had a 26% improvement in the FEV1,

or 1.54, and a 73% improvement in the FEF 25-75. (<u>Id.</u>) He had a total lung capacity of 91%

of predicted, a vital capacity of 64% of predicted, and a residual volume of 150% of

predicted. (<u>Id.</u>) Gas diffusion was normal at 84% of predicted. (<u>Id.</u>) There was a likely

possibility of a mild restrictive lung defect. (<u>Id.</u>)

Plaintiff returned to Crosstrails on August 9 with complaints of shortness of breath.

(<u>Id.</u> at 202-03.) He was seen by Leigh Little, an advanced practice registered nurse (APRN),

and was to be referred to a St. Louis pulmonologist. (<u>Id.</u> at 203.) At his next, August 23

visit, it was noted that he was to be seen by the pulmonologist on August 26. (<u>Id.</u> at 199-

200.)

That same day, Ms. Little completed a Pulmonary Residual Functional Capacity

Questionnaire. (<u>Id.</u> at 195-98.) It was noted that Plaintiff's initial visit to the office was one

month earlier. (<u>Id.</u> at 195.) Plaintiff's symptoms included shortness of breath, chest

tightness, wheezing, episodic acute bronchitis, fatigue, and coughing. (<u>Id.</u>) The precipitating

factors included upper respiratory infection, allergens, exercise, emotional upset or stress,

irritants, and cold air or a change in the weather. (<u>Id.</u>) According to Plaintiff, he had had six

severe attacks in the last year. (<u>Id.</u>) He had moderate to severe attacks every three to four

months, with an average attack lasting one to two hours. (<u>Id.</u> at 196.) Asked if Plaintiff was

a malinger, Ms. Little did not answer, noting that he had been seen two times prior to the

current visit. (<u>Id.</u>) His impairments were reasonably consistent with the limitations and the

symptoms.  (Id.)  According to Plaintiff, his symptoms were severe enough to constantly interfere with the attention and concentration he needed to perform even simple tasks.  (Id.) He was incapable of performing even low stress jobs because of the fumes, vapors, irritants, and exertional level.  (Id.)  Emotionally, he was stable.  (Id.)  His impairments had lasted, or could be expected to last, at least twelve months.  (Id.)  His prognosis was fair.  (Id.)  Asked to estimate Plaintiff's functional limitations if he was in a competitive work situation, Ms. Little recorded Plaintiff's answers.  (Id. at 197.)  He could not walk any city blocks without rest or severe pain; he could stand or sit longer than six hours if he did not have to exert himself or was not exposed to smoke, vapors, or irritants; he could frequently lift less than ten pounds, occasionally lift twenty pounds, and rarely lift fifty pounds; and he could frequently twist, occasionally stoop, bend, crouch, and squat, and rarely climb ladders and stairs.  (Id.)  He would sometimes need to take an unscheduled break when working, but how often, for how long, and whether he would need to lie down depended on the severity of the attack.  (Id.)  He needed to avoid moderate exposure to extreme cold and high humidity, concentrated exposure to wetness, and all exposure to extreme heat, cigarette smoke, perfumes, soldering fluxes, solvents, cleaners, fumes, odors, gases, dust, and chemicals.  (Id. at 198.)  How many days a month, ranging from none to more than four, he would miss from work as a result of his impairments depended on the type of work.  (Id.)  Ms. Little noted that Plaintiff had been referred for a pulmonary evaluation in five days and the pulmonologist would be better equipped to answer the questionnaire.  (Id.)

Plaintiff was seen at the Washington University School of Medicine Lung Center (WU Lung Center) on October 25 for an evaluation of possible occupational induced asthma. (Id. at 169-70, 175-88.) It was noted that he had been on regular inhaled steroids since obtaining Medicaid coverage after moving back to Missouri in March of the year. (Id. at 175.) He reported having a persistent wheeze and substernal pleuritic chest pain, but decreased sinus drainage and cough productivity and no ocular, arthritic, dermatologic, or central nervous system symptoms. (Id.) He did not have dysphagia (difficulty swallowing), gastroesophageal reflux disease, obstructive sleep apnea, or tuberculosis. (Id.) His medications included Advair, twice a day, Albuterol nebulizer, three times a day, Albuterol inhaler, as needed, hydrocodone, and Celexa, an antidepressant. (Id.) He was separated and lived alone. (Id. at 176, 187.) He was an ex-smoker and drank thirty beers a week. (Id. at 176, 187, 188.) He was assessed as having "[c]hronic alcohol consumption with cutaneous manifestations of liver disease." (Id. at 176.) On examination, he had moderate air entry with expiratory wheezes throughout which were worse on forced expiration. (Id.) The readings of an "[o]utside hospital spirometry" were consistent with a severe obstructive ventilatory defect with significant bronchodilator response. (Id. at 172, 176.) Lung volumes revealed air trapping without hyperinflation with a residual volume of 150% predicted. (Id.) His diffusing capacity was normal at 84%. (Id.) Pulmonary response tests administered then showed a FEV1 of 2.13, or 48% of predicted, pre-bronchodilator and 2.91, or 66% of predicted, post-bronchodilator. (Id. at 177.) His inhalers were changed to Foradil, Spiriva, and Pulmicort. (Id. at 176-77.) The Advair was discontinued. (Id. at 177.) A computed

tomography (CT) scan with expiratory and inspiratory views to assess air trapping and pulmonary function tests were to be obtained in the next few weeks.  (Id. at 177, 179, 182.) Plaintiff was to return in three to four months.  (Id. at 177, 179.)

At the beginning of February, 2007, Plaintiff had MRIs of his lumbar and thoracic spine, the former without contrast and the latter with and without contrast.  (Id. at 191-94.) With the exception of mild lower lumbar facet hypertrophy, the MRI of his lumbar spine was unremarkable.  (Id. at 194.)  The MRIs of his thoracic spine revealed a herniated disc at T7-T8.  (Id. at 191-93.)

Susan Cole, R.N., a clinical nurse specialist, with Cape Neurological Associates examined Plaintiff on March 8 pursuant to a referral by Vicki Roberts, M.D.  (Id. at 189-90.) Plaintiff complained of a dull pain at midline in the mid-thoracic region of his back.  (Id. at 189.)  The pain had started approximately two and one-half months ago, although he attributed it to a car airbag spontaneously deploying eighteen months earlier.  (Id.)  On examination, Plaintiff was in no acute distress, had a stable gait, had good motor strength, and had intact cerebellar testing, cranial nerves, deep tendon reflexes, and sensation.  (Id.) "Palpation of the thoracic region revealed no obvious muscle spasm though he was slightly tender to touch lateral to midline in the mid thoracic region."  (Id.)  The thoracic MRIs revealing the herniated disc were reviewed with a neurologist, David G. Yingling, M.D., who felt it appropriate to refer Plaintiff to a university-based neurosurgeon.  (Id. at 189-90.)

Pursuant to a worker's compensation claim, Plaintiff was examined by Shelby Kopp, M.D., on August 8 for the purpose of determining whether his lung problems were related

to his work.  (Id. at 150-58.)  It was noted that Plaintiff was using Advair twice a day, hydrocodone pain medication for his finger when needed, oxycodone for his back when needed, an Albuterol nebulizer four times a day, an inhaler, and Celexa and Spiriva (for COPD) daily.  (Id. at 152.)  He had stopped smoking in 2001 and drank two to three cans of beer a day.  (Id.)  He had been married four times, including his current marriage, and had three children, including a 20-year old, a 17-year old, and a 2-year old.  (Id.)  He had a hearing loss in his left ear and shortness of breath with walking, severe exertion, bending, emotional upset, and bathing.  (Id.)  If he was more symptomatic, he could climb only one-half flight of stairs.  (Id. at 153.)  If he was not, he could climb three or four flights.  (Id.)  He could walk only two or three blocks and could not climb a hill.  (Id.)  He was short of breath at night if he did not use his medication.  (Id.)  He did not have chest pain.  (Id.)  He did have occasional light-headedness if he became short of breath trying to walk up a hill or if he was coughing a lot.  (Id.)  He had some back pain.  (Id.)  He woke up approximately four times a night.  (Id. at 154.)  Pulmonary function testing revealed an FVC that was 60% of predicted, a FEV1 of 1.41, or 36% of predicted, %FEV1 was 49%, and a MMEF (mean maximum expiratory flow) that was 16% of predicted.  (Id. at 155, 158.)  These results were consistent with a severe obstructive defect with possible restrictive component.  (Id. at 155.)  Dr. Kopp opined that Plaintiff had a "severe obstructive lung defect with noted reversibility with bronchodilators indicating . . . a severe asthma problem."  (Id.)  Dr. Kopp further opined that there was no evidence of emphysema.  (Id.)

Various assessments of Plaintiff were also before the ALJ.

In January 2006, a Physical Residual Functional Capacity Assessment (PRFCA) of Plaintiff was completed by an agency non-medical consultant. (Id. at 94-101.) The primary, and only, diagnosis was asthma. (Id. at 94.) This impairment resulted in exertional limitations of Plaintiff being able to occasionally lift or carry fifty pounds; frequently lift or carry twenty-five pounds; and stand, walk, or sit about six hours in an eight-hour day. (Id. at 95.) He had postural limitations of only occasionally climbing ladders, ropes, or scaffold and of frequently climbing ramps and stairs, balancing, stooping, kneeling, crouching, and crawling. (Id. at 96.) He had no manipulative, visual, or communicative limitations. (Id. at 97-98.) He had environmental limitations of having to avoid concentrated exposure to extreme cold and extreme heat and even moderate exposure to fumes, odors, dusts, gases, poor ventilation, and hazards such as unprotected heights. (Id. at 98.)

The following month, Plaintiff underwent a psychological evaluation without testing pursuant to his DIB application. (Id. at 217-22.) Plaintiff reported that his vision was normal but he had ringing in his left ear. (Id. at 217.) He drank five beers a day to calm down but did not have a problem with alcohol. (Id.) He did not have a history of psychiatric hospitalizations and had never sought psychotherapy. (Id. at 218.) His emotional problems were that he was no longer able to work because of the chemical burn to his lungs. (Id.) He has been married four times and divorced three. (Id.) His longest marriage was nine years. (Id.) He hd three children, lived with his wife of three years, and had friends, with whom he talked and visited daily. (Id.) The longest job he had held was for three and one-half years. (Id. at 219.) He had been fired from one job due to resentment of authority. (Id.) His

grooming and hygiene were good; his clothing and eye contact were appropriate; his gait and activity level were normal.  (Id.)  He exhibited pain behavior and complained of his back hurting.  (Id.)  He was oriented to person, place, time, and situation.  (Id.)  He could maintain sufficient focus to answer questions.  (Id.)  On examination, his general information and language comprehension were good; his speech was clear; his thought and concentration were normal; his affect was appropriate; his mood was normal and lacking in anger or anxiety; appetite disturbance and loss of pleasure in daily activities were absent; and evidence of exaggeration of symptoms for secondary gain was absent.  (Id. at 220.)  The examiner, Bonnie L. Akinson, Ph.D., did not give an Axis I (clinical disorders and developmental and learning disorders) or Axis II (personality disorder or mental retardation) diagnosis.  (Id.) She rated his Global Assessment of Functioning at 80-85.[5]  (Id.)

Two weeks later, Frank J. Nuckols, M.D., a psychiatrist, completed a Psychiatric Review Technique form (PRTF) for Plaintiff.  (Id. at 102-15.)  He concluded that Plaintiff did not have a medically determinable mental impairment.  (Id. at 102.)  In support of this conclusion, Dr. Nuckols noted the one reference in July 2004 to anxiety and the reports of the consultative examination.  (Id. at 111.)

### The ALJ's Decision

---

[5]"According to the *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. Text Revision 2000) [DSM-IV-TR], the Global Assessment of Functioning Scale is used to report 'the clinician's judgment of the individual's overall level of functioning.'"  **Hudson v. Barnhart**, 345 F.3d 661, 663 n.2 (8th Cir. 2003); accord **Juszczyk v. Astrue**, 542 F.3d 626, 628 n.2 (8th Cir. 2008). A GAF between 71 and 80 is described as "[i]f symptoms are present, they are transient and expectable reactions to psycho-social stressors . . . ; no more than slight impairment in social, occupational, or school functioning . . . ."  DSM-IV-TR at 34.  A GAF higher than 80 indicates even less severe symptoms.  See id.

Analyzing Plaintiff's application pursuant to the Commissioner's sequential evaluation process, the ALJ first found that Plaintiff met the insured status requirement through December 31, 2009. (Id. at 12-14.) He had not been engaged in substantial gainful activity since his alleged onset date of September 26, 2005. (Id. at 14.)

The ALJ next found that Plaintiff had severe impairments of emphysema with a restrictive pulmonary component and chronic thoracic strain. (Id.) His alleged impairments of anxiety and depression were not severe. (Id.) Specifically, Plaintiff had no limitations in the functional areas of activities of daily living and social functioning due to his mental condition. (Id. at 14-15.) He had, at most, a mild limitation in the area of concentration, persistence, or pace. (Id. at 15.) Although he reported sleep problems and worrying at night, he had a normal activity level, appropriate orientation, normal concentration and memory, good language comprehension, and the abilities to maintain focus and perform simple mathematical calculations. (Id.) He had had no episodes of decompensation. (Id.)

His severe impairments did not, singly or in combination, meet or equal an impairment of listing-level severity. (Id.)

Addressing the question of Plaintiff's residual functional capacity (RFC), the ALJ found that he had the RFC to perform light work[6] with the exceptions of needing to avoid concentrated exposure to extremes of heat and cold and even moderate exposure to

---

[6]"Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b).

respiratory irritants and work hazards, e.g., working at unprotected heights or in close proximity to dangerous machinery. (Id.)

In reaching his conclusions about Plaintiff's RFC, the ALJ evaluated Plaintiff's credibility. (Id. at 16-23.) He found that Plaintiff's impairments could be expected to produce the alleged symptoms, but that his description of the intensity, persistence, and limiting effects of those symptoms was "not entirely credible." (Id. at 17.) After summarizing the medical evidence and Plaintiff's testimony, including his descriptions of working on automobiles and on the farm, the ALJ found the record to indicate that Plaintiff had mental and physical stamina and the ability to concentrate and use his arms and legs. (Id. at 17-20.) His driving, reading, and using the computer also was inconsistent with an inability to concentrate due to pain or anxiety or depression. (Id. at 20.) His social activities and reports of no difficulties in getting along with people were inconsistent with an inability to be around people due to disabling anxiety or depression. (Id. at 20-21.) Also inconsistent with such claims was the lack of any antidepressant or anti-anxiety medication, any psychiatric treatment, and any psychological counseling. (Id. at 21.) Consistent with the ability to function well was his GAF of 80 to 85. (Id.) Also, Plaintiff expressed himself at the hearing in a clear and logical manner and "did not appear to be in severe mental distress." (Id.)

The ALJ further found that Plaintiff's lack of strong pain relief medication was inconsistent with his complaints of disabling pain. (Id.) And, he did not seek regular and sustained treatment for his asthma, emphysema, nocturnal leg cramps, chronic finger strain,

and back strain.  (Id.)  No doctor or other medical professional had placed any restrictions on his ability to manipulate fine objects with his hands.  (Id.)  He had an FEV1 score of 2.13 after walking five blocks in six minutes and was functionally Class II with respect to his breathing impairment.  (Id.)  He could perform at least light work.  (Id.)

The ALJ also noted that Plaintiff's pulmonary function test FEV1 score of August 2006 would, "if supported with similar longitudinal evidence, meet the requirements of the appropriate listing in the Listings of Impairments."  (Id. at 19.)  He did not find such evidence, however, and further noted that Plaintiff had cold symptoms at the time, had normal breath sounds and was not in respiratory distress before his cold, and had ben found by the nurse to be able to stand and walk six hours in an eight-hour day.  (Id.)  Additionally, recent pulmonary function tests had shown improvement.  (Id.)

The ALJ considered Plaintiff's history of a relatively low income as it might be the basis for an allegation that he could not afford some needed treatment.  (Id.)  Any such argument was unavailing because there was no evidence he was ever refused treatment or medication and there was evidence that he had adequate access to health care.  (Id.)  Moreover, the money spent on beer could have been used to purchase any needed medication.  (Id. at 21-22.)  And, he receives Medicaid.  (Id. at 22.)

Plaintiff's breathing impairments and mental symptoms could be controlled with medication and were not, therefore, disabling.  (Id.)  Also, there was no evidence that any limitations had been placed by any physician on Plaintiff's functioning, that any physician had reported him disabled, or that Plaintiff had ever required surgery or prolonged

hospitalization. (Id.) Dr. Kopp's impression of severe emphysema with an asthma component was unpersuasive given his qualification that the limitation caused by such could not be assessed without further testing and the only pulmonary function test included with his report was one that did not show Plaintiff's post-bronchodilator scores. (Id.)

Plaintiff had been diagnosed by Dr. Crockett with emphysema and depression and prescribed medication for each. (Id.) He had not had the prescriptions filled, however, nor had he followed Dr. Crockett's instructions to engage in a regular exercise program and stop drinking. (Id.) Plaintiff's alcohol use also detracted from his credibility. (Id. at 23.) Other considerations detracting from that credibility were the possibility of a secondary motivation arising from the positive effect a favorable decision would have on his pending worker's compensation claim and his receipt of unemployment benefits for sixteen weeks with the accompanying certification that he was ready, willing, and able to work. (Id.)

With his RFC, however, Plaintiff could not return to his past relevant work. (Id.) With his age, education, transferable work skills, and RFC, he could perform jobs described by the VE. (Id. at 24-25.) He was not disabled within the meaning of the Act. (Id. at 25.)

## Legal Standards

Under the Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death. 42 U.S.C. § 1382c(a)(3)(A). The impairment suffered must be "of such severity that [the claimant] is not only unable to do his previous

work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has established a five-step process for determining whether a person is disabled.  See 20 C.F.R. § 404.1520; **Hurd v. Astrue**, 621 F.3d 734, 738 (8th Cir. 2010); **Gragg v. Astrue**, 615 F.3d 932, 937 (8th Cir. 2010); **Moore v. Astrue**, 572 F.3d 520, 523 (8th Cir. 2009).  "Each step in the disability determination entails a separate analysis and legal standard." **Lacroix v. Barnhart**, 465 F.3d 881, 888 (8th Cir. 2006).  First, the claimant cannot be presently engaged in "substantial gainful activity."  See 20 C.F.R. § 404.1520(b); **Hurd**, 621 F.3d at 738.  Second, the claimant must have a severe impairment.  See 20 C.F.R. § 404.1520(c).  The Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . . ."  Id.

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement. See 20 C.F.R. § 404.1520(d) and Part 404, Subpart P, Appendix 1.  If the claimant meets these requirements, he is presumed to be disabled and is entitled to benefits.  **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

"Prior to step four, the ALJ must assess the claimant's [RFC], which is the most a claimant can do despite [his] limitations."  **Moore**, 572 F.3d at 523 (citing 20 C.F.R.

§ 404.1545(a)(1)).  "[RFC] is not the ability merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." **Ingram v. Chater**, 107 F.3d 598, 604 (8th Cir. 1997) (internal quotations omitted). Moreover, "'a claimant's RFC [is] based on all relevant evidence, including the medical records, observations by treating physicians and others, and an individual's own description of [her] limitations.'" **Moore**, 572 F.3d at 523 (quoting Lacroix, 465 F.3d at 887).  "The need for medical evidence, however, does not require the [Commissioner] to produce additional evidence not already within the record.  '[A]n ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision.'" **Howard v. Massanari**, 255 F.3d 577, 581 (8th Cir. 2001) (quoting Frankl v. Shalala, 47 F.3d 935, 937-38 (8th Cir. 1995)) (alterations in original).

In determining a claimant's RFC, "'the ALJ must first evaluate the claimant's credibility.'"  **Wagner v. Astrue**, 499 F.3d 842, 851 (8th Cir. 2007) (quoting Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2002)).  This evaluation requires that the ALJ consider "(1) a claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of medication; and (5) functional restrictions."  **Id.** (citing Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)).  "'The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.'"  **Id.** (quoting Pearsall, 274 F.3d at 1218).  After

considering the <u>Polaski</u> factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000); **Beckley v. Apfel**, 152 F.3d 1056, 1059 (8th Cir. 1998).

At step four, the ALJ determines whether claimant can return to his past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. § 404.1520(e). The burden at step four remains with the claimant to prove his RFC and establish that he cannot return to his past relevant work. **Moore**, 572 F.3d at 523; <u>accord</u> **Dukes v. Barnhart**, 436 F.3d 923, 928 (8th Cir. 2006); **Vandenboom v. Barnhart**, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. **Pate-Fires v. Astrue**, 564 F.3d 935, 942 (8th Cir. 2009); **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001). <u>See</u> <u>also</u> 20 C.F.R. § 404.1520(f). The Commissioner may meet his burden by eliciting testimony by a VE, **Pearsall**, 274 F.3d at 1219, based on hypothetical questions that "'set forth impairments supported by substantial evidence on the record and accepted as true and capture the concrete consequences of those impairments,'" **Jones v. Astrue**, 619 F.3d 963, 972 (8th Cir. 2010) (quoting <u>Hiller v. S.S.A.</u>, 486 F.3d 359, 365 (8th Cir. 2007)).

If the claimant is prevented by his impairment from doing any other work, the ALJ will find the claimant to be disabled.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court "'if it is supported by substantial evidence on the record as a whole.'" **Wiese v. Astrue**, 552 F.3d 728, 730 (8th Cir. 2009) (quoting <u>Finch v. Astrue</u>, 547 F.3d 933, 935 (8th Cir. 2008)); <u>accord</u> **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001). "'Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the conclusion.'" **Wiese**, 552 F.3d at 730 (quoting <u>Eichelberger v. Barnhart</u>, 390 F.3d 584, 589 (8th Cir. 2004)). When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the Court must consider evidence that supports the decision and evidence that fairly detracts from that decision. **Moore**, 623 F.3d at 602; **Jones**, 619 F.3d at 968; **Finch**, 547 F.3d at 935. The Court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037, or it might have "come to a different conclusion," **Wiese**, 552 F.3d at 730. Thus, if "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, the [Court] must affirm the agency's decision." **Wheeler v. Apfel**, 224 F.3d 891, 894-95 (8th Cir. 2000). <u>See also</u> **Owen v. Astrue**, 551 F.3d 792, 798 (8th Cir. 2008) (the ALJ's denial of benefits is not to be reversed "so long as the ALJ's decision falls within the available zone of choice") (internal quotations omitted).

### Discussion

Plaintiff argues that the ALJ erred (1) when not finding he satisfied the criteria under Listing § 3.02A for a respiratory impairment and (2) when not finding him credible.

Plaintiff contends that he satisfies Listing § 3.02A based on his height, 70 inches, and the August 2006 and August 2007 FEV1 readings of less than 1.55. See 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 3.02A, Table I. It is undisputed that, absent any other consideration, his August 2006 FEV1 readings of 1.23 before the use of bronchodilators and 1.41 after and his August 2007 FEV1 reading of 1.41 before the use of bronchodilators meets the Table I criteria. There are, however, other considerations.

The regulations require that the pulmonary function test "be repeated after administration of an aerosolized bronchodilator under supervision of the testing personnel administered if the pre-bronchodilator FEV1 value is less than 70 percent of the predicted value." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 3.00E. "If a bronchodilator is not administered, the reason should be clearly stated in the record." Id. Plaintiff's pre-bronchodilator FEV1 value in the August 2007 test was 36% of predicted. The test was not repeated, nor was an explanation given for why not. Thus, the ALJ did not err in not relying on the FEV1 value.

The August 2006 test was administered pre-bronchodilator and post-bronchodilator. Both FEV1 readings are less than 1.55. An October 2006 test resulted in a FEV1 of 2.13, or 48% of predicted, pre-bronchodilator and 2.91, or 66% of predicted, post-bronchodilator. The regulations require that the highest value, "whether from the same or different tracings," be used when assessing the severity of a respiratory impairment. Id. Consequently,

regardless of whether the ALJ erred by discounting the August 2006 results as being influenced by a cold, he had to use the higher, October 2006 readings when determining whether Plaintiff satisfied Listing § 3.02A. Those readings establish that he does not.

Plaintiff next argues that the ALJ erred when evaluating his credibility because he (a) held him at fault for his condition by mistakenly finding he has emphysema and smokes; (b) considered Plaintiff's failure to obtain medical treatment as a negative when he had no money to obtain such; (c) mischaracterized the extent of his daily activities; (d) cited the improvement on pulmonary function tests post-bronchodilator; (e) cited his receipt of unemployment benefits although he had sought such only because he had no money; and (f) relied on Dr. Crockett's findings and not on Dr. Kopp's.

Plaintiff's first challenge to the ALJ's credibility finding is that the ALJ "suggest[ed]" he was at fault for his condition by labeling it emphysema and referring to his smoking. This strained reading lacks support. Plaintiff cited emphysema when applying for DIB and when testifying. He said he used to smoke. The ALJ did not draw the inference inferred by Plaintiff.

The ALJ did consider Plaintiff's lack of regular and sustained medical treatment as detracting from his credibility. The lack of sufficient financial resources to follow prescribed or recommended treatment or to pursue such treatment to remedy a disabling impairment may be "justifiable cause" for such a failure. See **Brown v. Barnhart**, 390 F.3d 535, 540 (8th Cir. 2004); accord **Clark v. Shalala**, 28 F.3d 828, 831 n.4 (8th Cir. 1994). In order to be such cause, there must be evidence that the claimant was denied medical treatment due to

financial reasons.  **Goff v. Barnhart**, 421 F.3d 785, 793 (8th Cir. 2005).  <u>See</u> <u>also</u> **Murphy v. Sullivan**, 953 F.2d 383, 386-87 (8th Cir. 1992) (rejecting claim of financial hardship in case in which there was no evidence that claimant had attempted to obtain low cost medical treatment or had been denied care because of inability to pay).  Such evidence is lacking in the instant case.  Rather, there is evidence Plaintiff had not gotten a prescription filled when he was still employed and had not sought regular medical treatment even after receiving Medicaid.  He had stopped physical therapy, which had helped, because of the cost of gas but continued to drink a substantial amount of beer.  <u>See</u> **Riggins v. Apfel**, 177 F.3d 689, 693 (8th Cir. 1999) (rejecting a lack of financial resources as an explanation for the absence of medical treatment or prescription medicine on the grounds that there was no evidence to suggest that the claimant had "sought any treatment offered to indigents or chose to forego smoking three packs of cigarettes a day to help finance pain medication").

Plaintiff next argues that the ALJ mischaracterized his daily activities, focusing on references to his working on old automobiles and his work on the farm.  This argument is itself a mischaracterization.  "'Acts which are inconsistent with a claimant's assertion of disability reflect negatively upon that claimant's credibility.'"  **Medhaug v. Astrue**, 578 F.3d 805, 817 (8th Cir. 2009) (quoting <u>Johnson v. Apfel</u>, 240 F.3d 1145, 1148 (8th Cir. 2001)); <u>accord</u> **Halverson v. Astrue**, 600 F.3d 922, 932 (8th Cir. 2010).  Plaintiff described a lifestyle and functioning ability severely restricted by his pulmonary impairment.  He also described working on old automobiles, working on the farm, pulling up carpeting, mopping floors, riding a motorcycle, and playing with his son.  He reported to a nurse that his

impairment constantly interfered with his ability to pay attention and concentrate to such an extent he could not perform even a simple task, but worked on cars, read, and used the Internet.

For the reasons set forth in the Listing § 3.02A discussion, the ALJ did not err in considering the post-bronchodilator results of the pulmonary function tests.

The ALJ also did not err in considering Plaintiff's receipt of unemployment benefits as detracting from his credibility. Where, as here, there is other evidence detracting from a claimant's credibility, "the acceptance of unemployment benefits, which entails an assertion of the ability to work, is facially inconsistent with a claim of disability." **Cox v. Apfel**, 160 F.3d 1203, 1208 (8th Cir. 1998); accord **Black v. Apfel**, 143 F.3d 383, 387 (8th Cir. 1998).

Nor did the ALJ err by considering the findings of Dr. Crockett and not of Dr. Kopp. Dr. Crockett's findings were but part of the entire medical record and were correctly considered as such. Dr. Kopp's report was issued pursuant to Plaintiff's worker's compensation claim. Plaintiff's argument that her report should be given greater weight because she evaluated him at the request of the insurer and was, therefore, biased in favor of the insurer is without foundation.

The ALJ having explicitly discredited Plaintiff's testimony and having "give[n] good reasons for doing so," see **Jones**, 619 F.3d at 975, the Court will defer to that determination.

## Conclusion

Considering all the evidence in the record, including that which detracts from the ALJ's conclusions, the Court finds that there is substantial evidence to support the ALJ's decision.

"As long as substantial evidence in the record supports the Commissioner's decision, [this Court] may not reverse it [if] substantial evidence exists in the record that would have supported a contrary outcome or [if this Court] would have decided the case differently." **Krogmeier v. Barnhart**, 294 F.3d 1019, 1022 (8th Cir. 2002) (internal quotations omitted). Accordingly,

      **IT IS HEREBY ORDERED** that the decision of the Commissioner is AFFIRMED and that this case is DISMISSED.

      An appropriate Judgment shall accompany this Memorandum and Order.

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this  8th  day of March, 2011.